IN THE UNITED STATES DISTRICT COURT FOR THE

DISTRICT OF NEBRASKA

GARY LAMONT ABRAHAM,           )
                               )
            Plaintiff,         )        8:11CV302
                               )
      v.                       )
                               )
DOUGLAS COUNTY, NEBRASKA,      )        MEMORANDUM OPINION
                               )
            Defendant.         )
_____)

This matter is before the Court on defendant Douglas County, Nebraska's ("Douglas County" or "defendant") Motion for Summary Judgment (Filing No. 49). For the reasons discussed below, the Court finds that defendant is entitled to summary judgment.

## I.   BACKGROUND

Plaintiff Gary Abraham ("Abraham") filed his complaint in this matter on September 7, 2011, against the Douglas County Sheriff's Department (Filing No. 1 at CM/ECF p. 1). The Court conducted an initial review of Abraham's complaint on October 14, 2011 (Filing No. 6). On initial review, the Court determined that Abraham had failed to state a claim upon which relief could be granted and provided him with an opportunity to amend his complaint. (Id.) Abraham filed an amended complaint on October 25, 2011, against Douglas County (Filing No. 7). Abraham's amended complaint is the operative complaint in this matter. In his amended complaint, Abraham seeks to hold Douglas County

liable under 28 U.S.C. § 1983 for the allegedly unconstitutional actions of Douglas County Officers Christopher Yordt ("Yordt") and Joseph Martinec ("Martinec").

On November 21, 2012, defendant filed a Motion for Summary Judgment and a Brief and Index of Evidence in support of its Motion (Filing Nos. 49, 50, and 51).  Abraham filed a Response to Defendant's Motion on December 6, 2012 (Filing No. 53).

## II.  DEFENDANT'S UNDISPUTED MATERIAL FACTS

The party seeking the entry of summary judgment in its favor must set forth "a separate statement of material facts about which the moving party contends there is no genuine issue to be tried and that entitles the moving party to judgment as a matter of law."  NECivR 56.1(a)(1).  If the non-moving party opposes the motion, that party must "include in its [opposing] brief a concise response to the moving party's statement of material facts."  NECivR 56.1(b)(1).  Such response must "address each numbered paragraph in the movant's statement and, in the case of any disagreement, contain pinpoint references to affidavits, pleadings, discovery responses, deposition testimony (by page and line), or other materials upon which the opposing party relies."  Id.  "Properly referenced material facts in the movant's statement are considered admitted unless controverted in the opposing party's response."  Id.

-2-

Defendant submitted a statement of material facts in accordance with the Court's Local Rules.  Further, defendant submitted evidence that was properly authenticated by affidavit. Abraham filed a response to defendant's Motion for Summary Judgment, but the response did not include anything that could be construed as a "concise response" to defendant's statement of materials facts under the court's local rules.  (*See* Filing No. 53.)  The Court deems this matter fully submitted and adopts the following relevant, undisputed material facts.

1.   At all times relevant to this action, Abraham resided at 3327 North 163rd Plaza, Apartment 302, Omaha, Nebraska ("Apartment 302").

2.   Yordt, Martinec, Denise Rieder ("Rieder"), and Matthew Martin ("Martin) are experienced law enforcement officers with the Douglas County Sheriff's Office ("DCSO").  They were each certified by the Nebraska Commission on Law Enforcement and Criminal Justice to perform duties as law enforcement officers. They completed training at the Nebraska Law Enforcement Training Center in Grand Island, Nebraska, and they receive other, ongoing training every year.

3.   Timothy Dunning ("Dunning") is the sheriff of the DCSO.  He is the ultimate decision and policy maker for the DCSO.

4.   The DCSO distributes all policies and procedures to DCSO staff when they are hired and also as they are updated,

-3-

including the policies regarding searches and seizures and the administrative investigation of complaints.

        5.   Prior to August 23, 2011, Yordt, Martinec, Rieder, and Martin had been trained on the provisions of GO-7-2007, which is the DCSO policy governing searches and seizures.  Accordingly, they had been trained to afford all persons detained or arrested the full use of their constitutional rights and to treat them in a professional manner.  Moreover, they had been instructed that (1) they could make an investigatory stop of an individual only when they had reasonable suspicion supported by specific facts that a crime had been or was about to be committed by the person stopped; (2) they could conduct a pat-down search for weapons for officer safety only when they reasonably believed that the individual presented a potential danger to them; (3) they could only cross the threshold of a private residence in an arrest situation when exigent circumstances existed; (4) exigent circumstances existed only when there was an emergency situation requiring swift action to prevent imminent danger to life or serious damage to property, or to forestall the imminent escape of a suspect or destruction of evidence; (5) exigent entry was only allowed to prevent destruction/loss of evidence or when there is a danger to the public; and (6) they could search with the voluntary consent of someone who has the authority to relinquish that right.

-4-

6.   Prior to August 23, 2011, Yordt, Martinec, Rieder, and Martin had been trained on the provisions of GO-27-2011, which is the DCSO policy governing codes of conduct.  They had been trained to (1) conduct themselves in a manner that reflects high ethical standards; (2) uphold, enforce, and administer the law according to the United States Constitution and the Nebraska Constitution so that equal protection of the law is guaranteed to everyone; (3) not allow their consideration of the status of others to alter or lessen this standard of treatment of others or influence their decisions; (4) enforce the law courteously and appropriately without fear or favor; (5) conduct themselves toward the public in a courteous and professional manner that fosters public respect and cooperation; (6) not express any prejudice concerning race in the performance of duties; (7) treat people with respect and courtesy; (8) guard against employing any officious or overbearing attitude or language that may belittle, ridicule, or intimidate the individual; (9) not make any search or seizure that they know or should know is not in accordance with law or DCSO procedures; and (10) stay abreast of current, ever-changing, case law/court decisions regarding search and seizure.  In addition, Officers Yordt, Martinec, Rieder, and Martin receive ethics training at least biannually.

7.   Prior to August 23, 2011, Yordt, Martinec, Rieder, and Martin had been trained on the provisions of GO-27-2008, which is the policy governing the investigation of complaints. They had been trained to uphold the DCSO commitment to providing citizens and employees with a fair and effective avenue for redress of their legitimate complaints against employees of the DCSO by conducting complete, thorough, and impartial investigations pursuant to the standards set forth in GO-27-2008. In addition, Yordt, Martinec, Rieder, and Martin understood that the DCSO would impose appropriate disciplinary action, or remove from employment, any employee who violated the policies and procedures of the DCSO or proved to be unfit for service.

8.   On August 23, 2011, Yordt, Martinec, and Rieder were on-duty.  They each responded to a robbery that had occurred approximately four blocks from Abraham's residence.  Robbery is a felony crime against a person that includes the use of force.

9.   Yordt, Martinec, and Rieder were informed that the suspect (a 6 foot tall, 190 pound possibly mixed race black or Hispanic male and/or black male) ran approximately four blocks westbound to the Cambury Hills apartment complex.  The officers went to that location in pursuit of the suspect with their lights and sirens activated.

10.   After arriving at the apartment complex, Yordt stated over the DCSO dispatch radio that a maintenance person

-6-

reported witnessing "a disturbance" that involved a black male throwing a baseball bat off of the balcony of Apartment 302.

11.   Thereafter, Yordt and Martinec knocked on the door of Apartment 302 because they believed they were in hot pursuit of the robbery suspect, that the suspect was located inside Apartment 302 and, because someone had thrown a bat off of the balcony, the occupants of Apartment 302 were attempting to destroy evidence.

12.   Yordt and Martinec did not have a warrant to search Apartment 302.

13.   Abraham was naked when he opened the door to his apartment.  Yordt and Martinec believed that Abraham opened the door naked in an attempt to alter his appearance or create a ruse.  However, Abraham alleges in his amended complaint that he was in the shower when the officers knocked on his door.

14.   Abraham gave Yordt and Martinec "verbal consent" to enter Apartment 302.

[1]  Upon entering the apartment, Yordt grabbed a pair of shorts off of a couch that was positioned three feet behind Abraham. Prior to handing the shorts to Abraham, Yordt checked the shorts for weapons.  Finding none, he handed them to Abraham.  Abraham

---

[1]Although not included in defendant's statement of material facts, the Court notes here that Yordt and Martinec's guns were drawn when they entered Apartment 302 (Filing No. 51-1 at CM/ECF p. 5; Filing No. 51-2 at CM/ECF p. 4).

put on these shorts within one minute of the officers' entry into his apartment.

15.   Yordt performed a protective sweep of the rooms in Apartment 302 because he believed others may be in Apartment 302. The search lasted less than one minute.

16.   Yordt and Martinec's contact with Abraham began within 10 minutes of the initial dispatch about the robbery, and lasted a total of 5 to 10 minutes.

17.   Abraham filed a citizen complaint against Yordt based on Yordt's entry into his apartment.  Martin investigated the complaint, but did not sustain Abraham's claims.

18.   Except for the citizen complaint and this action filed by Abraham, Yordt has never been the subject of a citizen complaint alleging that he performed an unlawful search or seizure, or that he discriminated against anyone.  Save for this case, none of his employers have been the subject of a civil claim or suit involving an allegation against him and his conduct.

19.   Except for this action filed by Abraham, Rieder and Martinec have never been the subject of a citizen complaint or had a civil claim or suit brought against them.  In addition, none of their employers have been the subject of a civil claim or suit involving an allegation against them and their conduct.

-8-

20.  At no time did the DCSO have a policy, custom, or informal practice of conducting unlawful searches and seizures in violation of the Fourth Amendment.  In addition, the DCSO does not have a policy, custom, or informal practice of discrimination based on race.

21.  In 2011, the Office of Professional Standards investigated 17 cases, including 9 external, citizen complaints, 8 internal complaints of employee misconduct.  Of these complaints, 32.3% of the cases were sustained and 67.7% were unsustained or exonerated.  The number of complaints and ratio of findings are substantially similar to the internal affairs investigations in 2009 and 2010.

22.  Dunning was familiar with the policies, customs, and practices of the DCSO as they existed throughout 2011.  At no time was he on notice that the DCSO had a policy, custom, or informal practice of conducting investigative detentions, pat-down searches, or warrantless entries or searches and seizures based on race in violation of the Fourth Amendment.  Dunning has instituted rigorous CALEA compliant policies, and he ensures that the law enforcement officers who serve under him are well versed in and trained to uphold the Fourth Amendment.  Dunning never has, nor would ever choose to be indifferent to constitutional misconduct under the Fourth Amendment (Filing No. 50 at CM/ECF pp. 2-8).

-9-

## III.   ANALYSIS

### A.   Summary Judgment Standard

Summary judgment should be granted only "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. Pro. 56(a).  It is not the Court's function to weigh evidence in the summary judgment record to determine the truth of any factual issue. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 249-51 (1986).  In passing on a motion for summary judgment, the district court must view the facts in the light most favorable to the party opposing the motion.  Dancy v. Hyster Co., 127 F.3d 649, 652-53 (8th Cir. 1997).

In order to withstand a motion for summary judgment, nonmoving parties must substantiate allegations with "'sufficient probative evidence [that] would permit a finding in [their] favor on more than mere speculation, conjecture, or fantasy.'" Moody v. St. Charles Cnty., 23 F.3d 1410, 1412 (8th Cir. 1994) (quoting Gregory v. City of Rogers, 974 F.2d 1006, 1010 (8th Cir. 1992)). "A mere scintilla of evidence is insufficient to avoid summary judgment." Id.  Essentially, the test is "whether the  evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." Anderson, 477 U.S. at 251-52.  In addition, in order to survive a motion for summary judgment under § 1983, a

-10-

plaintiff must raise a genuine issue of material fact as to whether the alleged unlawful conduct by the state actor deprived him of a constitutionally protected right.  *Nauke v. City of Parke Hills*, 284 F.3d 923, 927 (8th Cir. 2002).

**B.   Abraham's *Monell* Claims**

The essence of Abraham's section 1983 claim is that Douglas County is responsible for the alleged Fourth Amendment violations he suffered on August 23, 2011, when Officers Yordt and Martinec entered and searched his private residence without a warrant.  Abraham's claim implicates the principles set forth in *Monell v. Dep't of Soc. Servs.*, 436 U.S. 658 (1978).  In *Monell*, the Supreme Court explained that municipal liability under section 1983 may only attach where the "execution of a government's policy or custom, whether made by its lawmakers or by those whose edicts or acts may fairly be said to represent official policy, inflicts the injury" complained of.  *Id.* at 694. Thus, Abraham must prove two basic elements: (1) that a constitutional violation occurred, and (2) Douglas County is responsible for the violation.  Here, the Court need not decide whether Abraham suffered a deprivation of his Fourth Amendment rights.  Even assuming that a constitutional violation occurred, Douglas County cannot be held liable for it.

A governmental entity cannot be held vicariously liable for its agent's acts under section 1983.  *Id.*  Rather, a

-11-

plaintiff must identify a governmental "policy or custom that caused the plaintiff's injury" to recover from a governmental entity under section 1983. *Bd. of the Cnty. Comm'rs v. Brown, 520 U.S. 397, 403 (1997)* (citations and quotations omitted). A governmental policy "involves a deliberate choice to follow a course of action . . . made from among various alternatives by an official who has the final authority to establish governmental policy." *Doe v. Special Sch. Dist., 901 F.2d 642, 645 (8th Cir.1990)* (quotations and citations omitted). A governmental custom involves "a pattern of 'persistent and widespread' . . . practices which bec[o]me so 'permanent and well settled' as to have the effect and force of law." *Id.* at 646 (quoting *Monell, 436 U.S. at 691*).

Abraham's allegations focus almost entirely on whether the DCSO officers violated his constitutional rights. However, Abraham has sued Douglas County, not the officers. Thus, the question before the Court is whether a policy or custom caused Abraham's alleged injuries. Abraham's arguments on this issue are tenuous at best. Indeed, even liberally construed, the only allegation the Court can make out is that Douglas County should be liable for showing deliberate indifference to DCSO's custom, pattern, or practice of failing to train and supervise its officers on Fourth Amendment law. However, Abraham has failed to offer any evidence that the alleged violation of his Fourth

-12-

Amendment rights was the result of an unconstitutional municipal policy or custom.  Sheriff Dunning declared under penalty of perjury that DSCO policy instructs officers *not* to subject citizens of Douglas County to unreasonable searches and seizures, to afford all persons detained or arrested the full use of their constitutional rights, and to treat them in a professional manner (Filing No. 51-5 at CM/ECF p. 2).  Moreover, Abraham's general and conclusory allegation that officers are not properly trained is contradicted by Officers' Yordt, Martinec, Rieder, and Martin's unrebutted testimony regarding the training they receive as DCSO officers.  (*See* Filing No. 51, Attach. 1-5.)  Abraham offered no evidence to undermine this testimony.  Further, Sheriff Dunning declared that he has never been put on notice of any custom or practice of conducting investigative detentions, pat-down searches, or warrantless entries or searches and seizures based on race in violation of the Fourth Amendment (Filing No. 51-5 at CM/ECF p. 4).

Even if Abraham could prove that the search and seizure he complains of involved a constitutional violation, no reasonable jury could find that Douglas County had a policy or custom of encouraging unconstitutional searches and seizures.  *See Mettler v. Whitledge*, 165 F.3d 1197, 1204 (8th Cir.1999) ("A single incident normally does not suffice to prove the existence of a municipal custom.").  In light of defendant's uncontroverted

evidence about Douglas County's policies and customs, summary
judgment will be granted in favor of Douglas County.  A separate
order will be entered in accordance with this memorandum opinion.

DATED this 16th day of May, 2013.

BY THE COURT:

/s/ Lyle E. Strom

LYLE E. STROM, Senior Judge
United States District Court

---

*This opinion may contain hyperlinks to other documents or
Web sites.  The U.S. District Court for the District of Nebraska
does not endorse, recommend, approve, or guarantee any third
parties or the services or products they provide on their Web
sites.  Likewise, the Court has no agreements with any of these
third parties or their Web sites.  The Court accepts no
responsibility for the availability or functionality of any
hyperlink.  Thus, the fact that a hyperlink ceases to work or
directs the user to some other site does not affect the opinion
of the Court.